***********
Upon review of all of the competent evidence of record with reference to the errors assigned, and finding no good grounds to reconsider the evidence, receive further evidence, rehear the parties or their representatives, the Full Commission MODIFIES and AFFIRMS the Opinion and Award of the Deputy Commissioner.
 ***********
The Full Commission finds as fact and concludes as matters of law the following, which were entered into by the parties at the hearing as:
 STIPULATIONS
1. On December 12, 2000, the parties were subject to and bound by the provisions of the North Carolina Workers' Compensation Act.
2. The employee-employer relationship existed between plaintiff and defendant at all relevant times.
3. On December 12, 2000, defendant was the self-insured employer at risk for work-related injuries sustained by its employees, including plaintiff.
4. Plaintiff suffered a compensable injury by accident on December 12, 2000 arising out of and in the course of his employment with defendant.
5. Plaintiff's average weekly wage on December 12, 2000 was $1,161.25, resulting in the maximum compensation rate for the year 2000 of $588.00.
6. The parties stipulated into evidence the following at the hearing before the Deputy Commissioner:
a. Packet of medical records and reports.
b. Safety incident investigation report.
c. Form 19.
d. Pre-trial agreement dated March 25, 2002.
7. The issues before the Commission are: a) Is plaintiff entitled to additional temporary total disability compensation or other compensation? b) Is plaintiff entitled to additional medical benefits? c) Is plaintiff is entitled to temporary total disability or permanent partial disability? d) Is plaintiff entitled to a permanent partial disability rating?
 ***********
Based upon all of the competent evidence in the record, the Full Commission makes the following:
 FINDINGS OF FACT
1. Plaintiff, who was fifty-two years old at the time of the hearing before the Deputy Commissioner, began working for Weyerhaeuser on August 15, 1988 as a utility person. He received several promotions over the years and in December 2000 was working in the maintenance department.
2. His job involved keeping records, performing routine preventive maintenance on equipment, keeping the equipment running, ordering parts and making repairs when breakdowns occurred.
3. Plaintiff was a member of the local union, Local 1325 of the Paper, Allied-Industrial, Chemical and Energy Workers International Union AFL-CIO, on the date of the injury by accident.
4. At approximately 3:15 a.m. on December 12, 2000, plaintiff sustained a compensable injury by accident in the course of his employment with defendant when the ladder on which he was standing slipped, causing him to fall. As a result of the fall, plaintiff injured his right shoulder and thumb. Defendant admitted compensability of plaintiff's injury by filing a Form 60 dated April 11, 2001.
5. Plaintiff was working third shift from 7:00 p.m. to 7:00 a.m. on the morning of the accident. The plant nurse did not work this shift, so the supervisor on duty wrapped plaintiff's thumb and had him sit in the office. The supervisor filled out an Incident Report, but denied plaintiff's request for immediate medical treatment for his shoulder and thumb. Plaintiff sat in the office the remaining 3 hours and 45 minutes of the shift. Plaintiff was paid for the entire day of the injury.
6. At the end of the shift, plaintiff went home and slept. When he woke up, his thumb was bleeding. Plaintiff went to Eastern Carolina Internal Medicine which was the medical facility designated by defendant for treatment of work related injuries in the "New Bern Sawmill Policy and Procedures" handbook.
7. At Eastern Carolina Internal Medicine, plaintiff saw a physician's assistant who stitched his thumb laceration and gave him medication for his shoulder pain.
8. Plaintiff did not give an accurate history of his injury at Eastern Carolina Internal Medicine, but said that he fell while hanging Christmas lights. Plaintiff testified he said that because he wanted to keep defendant from having a recordable injury or loss time incident. Plaintiff testified defendant paid $60.00 to each employee in the department if for a three month period there are no recordable injuries. A recordable injury is one that requires medical care. A loss time injury is one in which an employee must miss work for an injury. Plaintiff testified that his department did not receive the $60.00 bonus for the three month period when his injury occurred because he later reported the injury.
9. Plaintiff was given a Group II violation on December 13, 2000 for failing to obey written or oral instructions, and another violation of engaging in horseplay was also noted. Plaintiff testified he received the reprimand for not contacting the nurse before getting medical treatment. However, the plant nurse was not on duty at the time of plaintiff's injury. Defendant had constructive notice that plaintiff needed medical care through the Incident Report completed on the shift when the accident occurred.
10. Defendant has two levels of violations or infractions for which employees may be reprimanded, according to Weyerhaeuer New Bern Saw Mill Plant Rules 6-17-88. The first violations are Group 1 violations which include the failure to report injuries and are treated less seriously than Group II.
11. On the Safety Incident Investigation Report, Stipulated Exhibit 2, the causes of the incident are listed as insecure grip or hold and using defective or unsafe equipment. It states that a rung of the ladder may have been bent at the time of the accident. The report states the floor had rain, oil and grease on it. The recommendations on the report were that two ladders be taken out of service and the floor cleaned. The report was signed by the supervisor of the shift, Don O'Neal.
12. Plaintiff worked at light duty for the next month. However, because plaintiff's right shoulder continued to bother him, he was referred to Dr. Mark Wertman, an orthopedic surgeon.
13. Dr. Wertman examined plaintiff on February 8, 2001 and diagnosed him with post-traumatic impingement syndrome and right shoulder rotator cuff tenopathy. The x-rays of his thumb revealed a small avulsion fracture and a mallet injury. Although Dr. Wertman noted minor loss of hyperextension of the thumb, because of the delay in treatment the injury, plaintiff could not be treated with splinting and no treatment was prescribed for that condition.
14. Dr. Wertman ordered an MRI which revealed a full thickness rotator cuff tear for which he recommended surgery.
15. Plaintiff submitted to an independent medical evaluation by Dr. Brian T. Szura on March 9, 2001. Dr. Szura concurred with Dr. Wertman's recommendation of surgery.
16. Dr. Wertman performed surgery on plaintiff's right shoulder on March 30, 2001 to repair the torn rotator cuff and to decompress the joint space.
17. Defendant sent Dr. Wertman correspondence within one week of surgery requesting plaintiff be returned to light duty work. Defendant continued to urge Dr. Wertman to release plaintiff to work as soon as possible following the operation. Dr. Wertman allowed plaintiff to return to essentially one-handed work on April 9, 2001 although plaintiff had restrictions of no driving and use of one arm only, and was taking narcotic pain medication. Defendant gave plaintiff light work duties within his restrictions.
18. On April 25, 2001, Dr. Wertman prescribed physical therapy limited to passive range of motion modalities only as the shoulder healed, but in May 2001 he ordered aggressive physical therapy to work on strengthening the joint.
19. As plaintiff regained strength in his shoulder, he was allowed to use it more at work.
20. On June 14, 2001 Dr. Wertman advised plaintiff to do no overhead lifting and to only lift a maximum of fifteen pounds up to waist level. Plaintiff's restrictions were changed to twenty-five pounds of lifting at waist level by July 10, 2001.
21. Plaintiff received a reprimand in June 2001, which is not a part of the written evidence of record. Plaintiff testified he had received what he believed was a Group II violation for leaving a message with his supervisor, Buddy Taylor, instead of speaking with the supervisor personally regarding his father's death. Plaintiff testified he had left a message regarding the fact that he would be taking time off from work for the funeral and to take care of affairs related to his father's death.
22. Plaintiff testified in the week preceding his father's death he took approved time off to be with his father and upon his death he spoke with Ernie White, a unit leader at the plant, before taking additional time off. Plaintiff testified he believed the leave had been granted and that a unit leader had the authority to grant such leave. Defendant presented no evidence at the hearing to show that plaintiff's beliefs were incorrect. Plaintiff filed a grievance with the union regarding this reprimand, which was not rescinded by defendant.
23. The agreement between the union and defendant states that funeral leave will be granted for three days and that additional unpaid leave may be granted pursuant to leave of absence provisions. The clause does not specify notification requirements. The provision requires proof of a relationship with deceased and lists those who are eligible, as well as the required relationship for the leave to be granted. Plaintiff testified that upon return to work he presented his supervisor with an obituary showing his father's picture. Mr. Taylor told him that this was not sufficient proof and that plaintiff had to obtain medical records from the hospital in order to be paid for the leave.
24. In July 2001, plaintiff was able to resume his normal work hours and earn his former wages. Defendant provided plaintiff with a helper to assist him with tasks that he was unable to perform.
25. On July 25, 2001 an incident occurred at work which plaintiff believed would result in his receiving a third Group II reprimand for violating a company safety rule involving a "lock out" procedure violation. Defendant required all of its mechanics to "lock out" any machines on which they were working in order to prevent injuries if employee started the machine without realizing that someone was working on it. Every mechanic working on the machine would put his or her lock on the circuit breaker so that the machine could not be started until all the locks were removed.
26. On July 25, 2001 plaintiff was working on a sawdust conveyor chain and had placed his personal lock on the circuit breaker to the machine. However, the lead person subsequently instructed him to remove his lock so that the machine could be restarted, and he complied. There were other locks on the circuit breaker and all but one was removed by the workers.
27. While other employees looked for the employee whose lock remained on the conveyor chain, Mr. Taylor came and inquired about the work completed and specifically asked about the tightness of the chain. While answering Mr. Taylor's questions, plaintiff reached into the machine and shook the chain to show how tight it was. It was a plant safety violation for an employee to reach into a machine after removing his lock and plaintiff's supervisor reported the infraction on a witness statement.
28. Plaintiff testified the machine could not have been operated at the time because another employee's lock was still on the circuit breaker which was in full view of both plaintiff and his supervisor. His supervisor did not stop him from reaching into the machine and did not comment on the violation until plaintiff was given Mr. Taylor's witness statement. Plaintiff also filed a witness statement and a grievance with the union in response to Mr. Taylor's witness report. Plaintiff testified that he was familiar with lock out procedures.
29. Plaintiff reported for work on July 26, 2001 and was approached by the union president and union shop steward who informed plaintiff that he was to be sent home and then terminated for having received three Group II violations. Under the Issue Resolution Procedure Clause of the Agreement between Weyerhaeuser New Bern Sawmill and AFL-CIO, the shop steward was involved in negotiating disputes and copies of reprimands were provided to the union.
30. Plaintiff testified that he was advised by his union president and the shop steward that in lieu of having a termination on his record, it would be preferable for plaintiff to resign.
31. The plant rules state the disciplinary consequences to be:
Group 1 —
1st — Oral warning
2nd — Written reprimand
3rd — 3 day layoff and final warning
 4th — Suspension — investigation and disciplinary action, up to and including discharge.
The plant rules further provide that "infractions of Group II rules are subject only to Step 4 under Group 1. After one year without further disciplinary action, previous action shall be inapplicable for disciplinary purposes but shall be retained as a matter of record."
32. On July 26, 2001, plaintiff submitted a written resignation to defendant. Plaintiff testified that he resigned based upon what his union representatives advised him to do.
33. Upon receiving plaintiff's resignation, defendant made no statements to him regarding the nature of the discipline which would have been imposed for his latest infraction.
34. The record reflects that both Mr. Taylor and Mr. White were present in the courtroom for the hearing before Deputy Commissioner Chapman on April 4, 2002 but did not testify.
35. Plaintiff testified that prior to the compensable injury by accident he had received only one reprimand for a lock out violation, which was more than twelve months before the one on December 13, 2000.
36. Dr. Wertman allowed plaintiff to increase his activities in August 2001. By that time plaintiff was looking for other employment but had not found a position.
37. Dr. Wertman determined on October 22, 2001 plaintiff had reached maximum medical improvement and assigned a 5% permanent partial disability rating to his right arm and a 0% rating to his right thumb.
38. Dr. Wertman testified that considering the seriousness of his injury, plaintiff had made a good recovery. Plaintiff was not given specific restrictions but was released to return to regular work duties with the understanding that he was not to push his shoulder too far. Dr. Wertman testified he was not provided a job description and that he might have issued specific restrictions had plaintiff been seeking a specific job. Dr. Wertman advised plaintiff to be careful with repetitive overhead lifting and to gradually increase the amount of lifting he did.
39. Plaintiff was unable to find employment until January 8, 2002 when he began working for a construction company 40 hours a week. He left the construction company later that month for a permanent position. Plaintiff began working for E J Automotive 40 hours a week making $8.00 per hour. Both jobs paid considerably lower wages than he had earned while working for defendant.
40. Plaintiff was not receiving disability compensation on July 25, 2001 because he was earning his regular wages and defendant did not resume payment of benefits after his resignation.
41. Plaintiff had been employed with defendant for 12 years prior to his injury by accident and the record reflects he was reprimanded one time prior to his injury. In the seven months following his injury by accident, plaintiff received two Group II reprimands and anticipated a third Group II reprimand on the date he resigned. No evidence was presented to show that a nondisabled employee would have been reprimanded for similar violations.
42. Plaintiff reasonably believed that he was to be terminated based upon the information he was given by the union president and union shop steward and he reasonably relied on that information as the basis for his resignation. Plaintiff's belief that termination was imminent was not rebutted by defendant at the hearing before Deputy Commissioner Chapman. The Full Commission finds that plaintiff's termination of employment was not voluntary, but rather was predicated on information from his union officials, as well as the witness report filed by his supervisor and his previous reprimands.
43. At the time of the termination of his employment, plaintiff was not at maximum medical improvement and was still working under restrictions and therefore unable to return to all of the job duties required in his regular job.
44. Based upon the greater weight of the medical evidence, the Full Commission finds that plaintiff retained some work restrictions and partial disability subsequent to his release at maximum medical improvement on October 22, 2001.
45. Plaintiff made reasonable efforts to find suitable employment after his termination from defendant's employment but none was available to him within his physical restrictions until he returned to employment at reduced wages on January 8, 2002.
46. Plaintiff's wages since January 8, 2002 are less than he was making at the time of his injury by accident and plaintiff's decreased ability to earn is due to his disability resulting from the admittedly compensable injury by accident on December 12, 2000.
 ***********
Based upon the foregoing stipulations and findings of fact, the Full Commission makes the following:
 CONCLUSIONS OF LAW
1. On December 22, 2000, plaintiff sustained an injury by accident arising out of and in the course of his employment with defendant. N.C. Gen. Stat. § 97-2(6).
2. Defendant admitted compensability of plaintiff's injury by accident by filing a Form 60 on April 11, 2001.
3. Plaintiff did not voluntarily resign from his employment on July 26, 2001, and thus his termination from employment must be analyzed pursuant to Seagraves v. Austin Co. of Greensboro, 123 N.C. App. 228,472 S.E.2d 397 (1996). The evidence in this case does not show that plaintiff was terminated for misconduct or fault, unrelated to the compensable injury, for which a nondisabled employee ordinarly would have been terminated. Id. Therefore, plaintiff's conduct does not constitute a constructive refusal of employment. N.C. Gen. Stat. § 97-32;Seagraves v. Austin Co. of Greensboro, supra.
4. Because defendant admitted compensability of plaintiff's injury by accident by filing a Form 60, there is no presumption of continuing disability and therefore the burden of proving disability remains with plaintiff. Sims v. Charmes/Arby's Roast Beef, 142 N.C. App. 154,542 S.E.2d 277, disc. rev. denied, 353 N.C. 729, 550 S.E.2d 782 (2001).
5. Plaintiff met his burden of proving disability after July 26, 2001 by producing evidence that after a reasonable job search, he obtained other employment at wages less than those earned prior to the compensable injury. Larramore v. Richardson Sports Ltd. Partners, 141 N.C. App. 250,540 S.E.2d 768 (2000), aff'd per curiam, 353 N.C. 520, 546 S.E.2d 87
(2001); Bond v. Foster Masonry, Inc., 139 N.C. App. 123, 532 S.E.2d 583
(2000).
6. As the result of the compensable injury by accident, plaintiff was disabled and is entitled to compensation for total disability at the rate of $588.00 per week for the period beginning July 26, 2001 through January 7, 2002. N.C. Gen. Stat. § 97-29.
7. Plaintiff is entitled to partial disability benefits at the rate of two-thirds of the difference between his average weekly wages before the injury and the average weekly wages which he was able to earn thereafter beginning January 8, 2002 for 300 weeks from the date of injury. N.C. Gen. Stat. § 97-30.
8. As a result of the compensable injury by accident, plaintiff is entitled to have defendant pay for all medical treatment which tends to effect a cure, give relief or lessen plaintiff's period of disability. N.C. Gen. Stat. §§ 97-25, -25.1.
9. As the result of the compensable injury by accident plaintiff retains a permanent impairment rating of 5% to his right arm. N.C. Gen. Stat. § 97-31(13). Plaintiff is deemed to have selected the more munificent remedy under the statutes, which is compensation for partial disability. N.C. Gen. Stat. §§ 97-29, -30.
 ***********
Based upon the foregoing findings of fact and conclusions of law, the Full Commission enters the following:
 AWARD
1. Defendant shall pay plaintiff total disability compensation at the weekly rate of $588.00 from July 26, 2001 through January 7, 2002. This amount has accrued and shall be paid in a lump sum, subject to the attorney's fee approved below.
2. Defendant shall pay partial disability compensation from January 8, 2002 and continuing for 300 weeks from the date of injury or until plaintiff earns the same wage as he made on December 12, 2000. Those amounts which have accrued shall be paid in a lump sum, subject to the attorney's fee approved below.
3. Defendant shall pay for all related medical expenses that are reasonably necessary to effect a cure, give relief or lessen the period of plaintiff's disability.
4. An attorney's fee in the amount of twenty-five percent of the compensation awarded above is hereby approved for plaintiff's counsel, which shall be deducted and paid directly to plaintiff's counsel.
5. Defendant shall pay the costs.
This the ___ day of July 2003.
 S/______________________ LAURA KRANIFELD MAVRETIC COMMISSIONER
CONCURRING:
 S/_____________ THOMAS J. BOLCH COMMISSIONER
 S/_______________ CHRISTOPHER SCOTT COMMISSIONER
LKM/kjd